UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BALTIMORE COUNTY,                    )
                                     )
                  Plaintiff,         )
                                     )
      v.                             )    CASE NO. 1:04-cv-07014-DFH-TAB
                                     )
AT&T CORPORATION., et al.,           )
                                     )
                  Defendants.        )


ENTRY ON PENDING MOTIONS FOR SUMMARY JUDGMENT

This case is the last contested portion of Multi-District Litigation No. 1313,
*In re AT&T Corporation Fiber Optic Cable Installation Litigation.*  The MDL case has
managed and resolved claims arising from AT&T's installation of fiber optic cable
in the 1980's along railroad corridors with permission from the railroads but
without permission from the adjoining landowners.  The plaintiffs have been
owners of adjoining land who asserted claims against AT&T for trespass, slander
of title, and unjust enrichment.  The MDL proceeding has provided an umbrella
under which the court and parties have resolved state law claims of tens of
thousands of landowners adjoining thousands of miles of railroads.  Those claims
have been resolved through a series of more than 30 statewide class action
settlements.  None of the landowners have objected to the settlements, under
which the owners received substantial cash and AT&T received a clear title to an
easement.

This remaining case is based on AT&T's installation of underground fiber optic cable in railway corridors that pass through Baltimore County, Maryland. Baltimore County itself owns twelve parcels of property along one of those railroad lines, now known as the CSX line from Baltimore to Finksburg. As the owner of those parcels, Baltimore County fell within the definition of a nationwide plaintiff class certified by an Indiana state court before the action was removed to federal court in this district.[1]

The claims of most Maryland property owners were resolved by a class settlement. Baltimore County exercised its right to opt out of the class settlement, however, and filed its own complaint seeking damages, an injunction, and ejectment against AT&T and an AT&T employee under theories of trespass, unjust enrichment, and fraud. See Dkt. No. 17 (Second Amended Complaint). Over the course of this litigation, the County has narrowed its property-based claims to only twelve parcels of land, all of which lie along the CSX Baltimore-to-Finksburg

---

[1]The first complaint was filed on November 6, 1996 by plaintiff Vera Hinshaw in the Hamilton Superior Court, *Hinshaw v. AT&T Corp.*, No. 29D01 9705-CP-308. On August 24, 1998, the state court certified a nationwide class, and *Hinshaw* was removed to this court, where it became the foundation for the Multi-District Litigation. That Indiana complaint served to toll the statute of limitations for similarly situated property owners who fell within the class definition. See generally *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) (allowing person within scope of defined but uncertified class to intervene after statute of limitations would have run on individual claim); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) (allowing person within scope of defined class to bring separate suit after denial of class certification).

railway corridor.  See Dkt. No. 95, ¶ 4; see also Dkt. 104, Exs. A-C (Lathrop Report).[2]

The defendants have filed several motions for summary judgment.  The court has chosen to address them in an order different from the order of filing, but this entry resolves all of the pending motions.  In summary, the court grants summary judgment for AT&T regarding four of the twelve disputed parcels.  The railroad owns the title in fee simple to one parcel, and the claims arising from the other three parcels were resolved through the class settlement before the County acquired them.  The court also grants partial summary judgment for AT&T to bar damages based on the County's franchise ordinance, and the court grants summary judgment for the one individual defendant.  The court rejects AT&T's other arguments for summary judgment on the remaining parcels, including theories that the cables are authorized by the railroad easement and that the statute of limitations bars the County's claims.  The court will retain jurisdiction of this case for a further brief period to resolve a discovery problem, but will then

---

[2]In response to the defendants' first motion for summary judgment, the County acknowledged that it had no separate cause of action for alleged violations of the County's franchise ordinance, but asserted that the alleged violations provided an element of damages for other torts.  Dkt. No. 54 at 40.  Those torts are limited to the twelve Lathrop Parcels.  The County later said that is "has not limited the claims in its Second Amended Complaint to twelve properties. Baltimore County continues to pursue franchise claims with respect to the entire CSX corridor."  Dkt. No. 144 at 2.  This about-face came too late.  The case is limited to the twelve Lathrop Parcels.

invite the Judicial Panel on Multi-District Litigation to transfer this case to the District of Maryland for final resolution.[3]

*Standard for Summary Judgment*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The motion should be granted so long as no rational fact finder could return a verdict in favor of the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party. See Fed. R. Civ. P. 56(c)(2); *Anderson*, 477 U.S. at 255. However, a party must present more than mere speculation or conjecture to defeat a summary judgment motion. The issue is whether a reasonable jury might rule in favor of the non-moving party based on the evidence in the record. *Id.* at 251-52.

_____

[3]AT&T's motions have been pending for more than three years, which is highly unusual. The court has held them for resolution because most of the court's and the parties' efforts in the much larger Multi-District Litigation have been directed toward settling all of the other cases.

I.      *The Scope of the Grants to the Railroad (Dkt. No. 121)*

The County contends that AT&T trespassed and continues to trespass on parcels of land owned by the County when it installed its underground fiber optic cable in the CSX Baltimore-to-Finksburg corridor.  In one of its motions for summary judgment, AT&T argues that the original grantors of eleven of the twelve parcels effectively transferred all of their property interests in the corridor to CSX's predecessor, abandoning their property interests and granting what amounted to a title in fee simple to the railroad.  If CSX, as successor in interest to those original land grants, owned the corridor in fee simple, then it had the authority to grant AT&T permission to install the cable.  In that case, the County, as merely the owner of the adjoining property, would not have a viable trespass claim based on AT&T's installation of the cable on these eleven properties.  In the alternative, AT&T argues that if the original grants created only easements and were not grants in fee simple, the act of installing the cable was still within the scope of the railroad's easement and again could not have amounted to a trespass against the County's property rights.  The court finds that CSX had a title in fee simple to only one of the eleven properties.  AT&T is entitled to summary judgment on that parcel, but not the other ten.  AT&T's installation of the cable is beyond the scope of the original grants of rights-of-way for the railroad.

A.      *Undisputed Facts*

The County has limited its claims to the twelve Parcels identified in the Lathrop Report and its supplements, see Dkt. No. 123, Exs. A-C, prepared by Wendy Lathrop, a surveyor who assisted the County in this suit. Each of these properties is adjacent to the CSX Baltimore-to-Finksburg railroad corridor in Baltimore County. Between 1853 and 1857, a company called the Western Maryland Rail Road Company, CSX's predecessor in interest, acquired interests in eleven of the twelve parcels in granting documents.[4] Joel Leininger, a Maryland surveyor who assisted AT&T, reviewed the Lathrop Report, examined the deeds pursuant to which the County claims ownership of the Lathrop Parcels, examined the nineteenth-century Western Maryland Rail Road Company granting documents, and examined valuation maps supplied by CSX for the CSX corridor. Dkt. No. 123, Ex. W. ¶¶ 2-5. Leininger correlated the Lathrop Parcels with the adjoining sections of the CSX rail corridor and identified the granting document(s) that corresponded to each Lathrop Parcel. *Id.*, ¶ 6. Leininger prepared a chart showing which Exhibit applies to which Parcel. Dkt. No. 122 at 4-5; Dkt. 123, Ex. W, ¶ 7. The County has not raised a genuine issue of fact as to the accuracy of the chart.[5] For ease of reference, the court replicates it here in part:

Lathrop

---

[4]The parties have not presented granting documents for the railroad's interest in Lathrop Parcel 7.

[5]The County argues that because Exhibits R-U do not contain descriptions of the properties being transferred to the railroad, they are unreliable. Dkt. No. 144 at 5-6. The County's mere argument is not sufficient to raise a genuine dispute with Leininger's evaluation of which Exhibit correlates to which Parcel. His affidavit is admissible on summary judgment, and its contents have not been disputed.

| Parcel No. | Date | Grantor | Exhibit: |
|---|---|---|---|
| 1 | 7/6/1857 | Francis Humbrays (Humphreys) | Exhibit R |
|  | 6/23/1857 | Johnsey Gardner | Exhibit S |
|  | 6/22/1857 | Johnsey Gardner | Exhibit T |
| 2 | 6/23/1857 | Johnsey Gardner | Exhibit S |
|  | 6/23/1857 | Johnsey Gardner | Exhibit T |
|  | 12/15/1853 | Elijah Gore | Exhibit U |
|  | 7/6/1857 | Elijah Gore | Exhibit R |
| 3 | 12/15/1853 | Elijah Gore | Exhibit U |
|  | 7/6/1857 | Elijah Gore | Exhibit R |
| 4 | 12/15/1853 | Johnsey Gore | Exhibit U |
| 5 | 12/15/1853 | Elijah Gore | Exhibit U |
|  | 7/6/1857 | Elijah Gore | Exhibit R |
| 6 | 7/6/1857 | Isaac Snavely (Schnavely) | Exhibit R |
| 8 | 7/6/1857 | Allison Shipley | Exhibit R |
| 9 | 7/6/1857 | Christian Weishampel (Weisampel) | Exhibit R |
| 10 | 7/6/1857 | Isaac Snavely (Schnavely) | Exhibit R |
| 11 | 7/6/1857 | Isaac Snavely (Schnavely) | Exhibit R |

None of the granting documents pertain to Lathrop Parcel 7.

The legal issue of ownership depends on the language used in these key documents. Exhibits R, S, T, and U used the following language, with minor variations:

TO ALL WHOM THESE PRESENTS SHALL COME, GREETING:

WHEREAS, the General Assembly of Maryland has passed a law incorporating the WESTERN MARYLAND RAIL ROAD COMPANY, for the purpose of opening and making a Road either from the City of Baltimore, or

some suitable point on the Northern Central Rail Road [Baltimore and Susquehanna Rail Road], or any branch of the same, to be by the President and Directors of said Company determined, to the town of Westminster, and thence westardly to some point on the Monocacy River, in the direction of Hagerstown:

And whereas, the President and Directors of said Company, aware that the lands lying in the Route that may be selected for the Road will be greatly enhanced in value by the passage of the Road through or near them; and conceiving that the owners of such lands, as an equivalent for that advantage, *should relinquish such portions thereof as may be required for the Road,* as well as what may be excavated in making the Road, without making any charge upon the said WESTERN MARYLAND RAIL ROAD COMPANY for the same, unless in making the Road any buildings upon the lands should be destroyed, and then only for such sum as upon a fair valuation, to be estimated by disinterested persons, may be determined to be their actual value; and should, moreover, permit stone, gravel, clay and such other materials as may be required for the construction of the Road, and to which otherwise no value would be attached, to be used for that purpose, free of expense, are desirous of ascertaining if the owners of lands lying in the several routes which have been contemplated or may be examined for the location of the Road, *will consent to the relinquishment,* and grant the permission adverted to, before the route of the Road, is determined on, as the advantage of two or more routes, being otherwise equal, the preference would be given to that, to which these additional advantages may be recorded to the greatest extent.

NOW, THEREFORE, WE, the subscribers, having been notified, that our lands are supposed to be situated on one or more of the routes contemplated for the Road referred to, and being called upon to state, whether or not, we will give the consent above stated, do hereby bind ourselves, our heirs, executors, administrators and assigns, for the consideration above mentioned, *to make the relinquishment* and grant the permission above required, for the purposes before mentioned.

See Dkt. No. 123, Exs. R-U (emphases added).  The documents also contain

additional references to "roads" and "rights of way."  For instance, on June 22,

1857, Johnsey Gardner signed Exhibit T with the above language, but just above

his signature is written the sentence:  "I will give the right of way provided the road

passes south of the Reisterstown Turnpike."  Elijah Gore's grant in Exhibit U

includes the following additional language:  "I hereby agree to give the right of way through my land.  Provided the Company will make the necessary fencing along said Road through my land at their expense, and make the necessary cross ways."  Each of the documents is titled "Right of Way" or "Release of Right of Way."  Dkt. No. 123, Ex. R-U.  The documents do not contain metes-and-bounds descriptions of the property being conveyed, and they do not contain "habendum" or "granting" clauses.

The remaining Lathrop Parcel 12 was conveyed by Christopher Hofmann to the Western Maryland Rail Road Company on October 20, 1905.  Hofmann agreed to the following:

> WITNESSETH, that in consideration of the sum of Fifty five Dollars, the receipt of which is hereby acknowledged by the party of the first part, the said Christopher Hofmann doth grant and convey unto the said THE WESTERN MARYLAND RAILROAD COMPANY, its successors and assigns, in fee simple, all that piece and parcel of land situate, lying and being in the County of Baltimore in the Second Election District near McDonough Station on the Western Maryland Railroad, containing .048 acres, said parcel of land being particularly described as follows . . .

Dkt. No. 123, Ex. V (metes-and-bounds description omitted).  The County concedes that this grant amounted to a grant of title in fee simple and has withdrawn its claims regarding this parcel.  AT&T is entitled to summary judgment on all claims concerning Lathrop Parcel 12.

B.      *The Meaning of "Relinquish"*

Based on these nineteenth-century documents "relinquishing" certain rights to Lathrop Parcels 1-6 and 8-11 to the railroad, AT&T argues that the grantors granted the railroad the land in fee simple.   The court disagrees.

Under Maryland law, the construction of granting language is a question of law for the court, and the usual principles of contract interpretation apply.   *Chevy Chase Land Co. v. United States*, 733 A.2d 1055, 1062 (Md. 1999), citing *Buckler v. Davis Sand & Gravel Corp.*, 158 A.2d 319, 322 (Md. 1960).   These principles require consideration of "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Calomiris v. Woods,* 727 A.2d 358, 363 (Md. 1999) (quotation omitted).   In the construction of deeds, "the intention of the parties, to be ascertained from the whole contents of the instrument, must prevail unless it violates some principle of law."   *D.C. Transit Systems v. S.R.C.*, 270 A.2d 793, 798-99 (Md. 1970) (quotation omitted).   If unambiguous language is interpreted, the plain meaning of the words should control.   *All State Home Mortgage, Inc. v. Daniel,* 977 A.2d 438, 447 (Md. App. 2009), quoting *Nova Research, Inc. v. Penske Truck Leasing Co.*, 952 A.2d 275 (Md. 2008).

AT&T relies primarily on *United States v. 1.44 Acres of Land*, 304 F. Supp. 1063 (D. Md. 1969), in which the United States sought to condemn land that was part of an abandoned trolley line.   In construing one deed, the court interpreted the granting words "give, bargain and sell, alien, enfeoff, release and convey . . .

forever." *Id.* at 1071.  The court examined the deed as a whole, focusing on the word "forever" and the fact that the grant was for "all the estate, right, title, and interest either at law or in equity or otherwise."  In light of the defendant's exercise of ownership over the property, the court concluded that the deed had conveyed title in fee simple.  *Id.* at 1072.  In the same opinion, however, the court interpreted another deed that "grant[ed] and convey[ed]" to the railway, its successors and assigns "a right of way for its chartered purposes upon and over the strip of land" as granting only an easement.  *Id.* at 1070-71.

In this case, the use of the term "right-of-way" in the granting documents indicates that only easements were intended.  *D.C. Transit Systems*, 270 A.2d at 800 ("The addition of the language for 'a right of way' in the habendum clause . . . makes clear the intent of the parties to grant an easement. . . ."); *Richfield Oil Corp. v. Chesapeake & C.B.R. Co.*, 20 A.2d 581, 587-88 (Md. 1941) ("'Where the intention to convey a fee does not appear, as in the conveyance of a right of way for the railroad through certain lands, the company takes an easement only.'"), quoting 2 Elliott on Railroads § 1158, at 627-28 (3d ed. 1907) (internal quotation marks omitted); *Greenwalt v. McCardell*, 12 A.2d 522, 524 (Md. 1940) ("Where a right of way is established by reservation, the land remains the property of the owner of the servient estate, and he is entitled to use it for any purpose that does not interfere with the easement.").  Maryland courts presume that the grant of a right-of-way to a railroad is an easement if the deed fails to convey expressly the grantor's intent to create a fee simple interest.  See *Miceli v. Foley*, 575 A.2d 1249,

1264 (Md. App. 1990).  There is no express grant of a fee simple interest in the ten documents at issue here.  The words "right-of-way" are not found in the granting language (though they are in the documents' titles), but neither are words indicating a grant in fee simple.  The mere use of the word "relinquish" is not enough to override the presumption that unless a fee is specified, an easement has been created.  After all, the grantors here were certainly relinquishing something. The choice of the verb tells us nothing about the identity of the object of the verb. The grantors could have "relinquished" easements as easily as they could fee simple titles.[6]

Although perhaps not dispositive by itself, it is highly relevant that whatever interests these grantors "relinquished," they gave up for no monetary compensation.  Maryland courts and courts in other states have looked to the amount of compensation received to discern whether a grant was of a fee simple or an easement.  See *Hodges v. Owings*, 13 A.2d 338, 340 (Md. 1940) (looking to nominal consideration in determining that the purpose of the grant was to build a railroad and that the grantor was willing to cooperate by giving an easement); *Daugherty v. Helena & Nw. Ry.*, 252 S.W.2d 546, 548 (Ark. 1952) ("The recited consideration reflects that the grantors accepted a nominal sum for the deed

---

[6]AT&T finds support for its argument in *Louisville & Indiana Railroad Co. v. Indiana Gas Co.*, 792 N.E.2d 885, 888 (Ind. App. 2003).  As AT&T notes, the Indiana Supreme Court vacated and reversed that decision, though without addressing this specific point.  829 N.E.2d 7 (Ind. 2005).  In any event, the Indiana Court of Appeals based its decision on language in the deed – conveying both a right of way and "all my interest" in the land – that is not present here. 792 N.E.2d at 891.

because they were interested not in selling land but in assisting the company to complete its line."); *Tamalpais Land & Water Co. v. Northwestern Pac. R.R. Co.*, 167 P.2d 825, 830 (Cal. App. 1946) ("[T]he fact no monetary consideration, or only a nominal monetary consideration was paid for the grant is a factor of considerable importance indicating that the grant conveys an easement and not a limited fee."); *Gabbard v. Short*, 351 S.W.2d 510, 511 (Ky. 1961) (considering "amount of consideration paid" in determining that title passed in fee simple); *Battelle v. New York, New Haven & Hartford R.R. Co.*, 97 N.E.1004, 1005 (Mass. 1912) (presumed payment of full value for land was evidence that a fee was intended); *Texas & Pac. Ry. Co. v. Martin*, 71 S.W.2d 867, 388 (Tex. 1934) (consideration for fair value of the parcel of land was evidence that land was granted in fee simple).  The nineteenth-century grantors of the Maryland properties in dispute here received no compensation other than the privilege of hosting the railroad and its tracks on their land.  That fact bolsters the conclusion that the railroad received only an easement for the ten parcels still disputed on this point.

Maryland also recognizes substantial policy reasons for construing ambiguous grants made to railroads as easements rather than fee simple titles. As the State's highest court explained:

> A great number of railroad corridors have been abandoned in recent years. See *Preseault v. ICC,* 494 U.S. 1, 5 (1990) (observing that the nation's railway system has lost about 130,000 miles of track since 1920 and noting that "experts predict that 3,000 miles will be abandoned every year through the end of this century") (footnote omitted).  Whether a right-of-way is construed as an estate in fee simple or an easement has significant implications for the

utility of the land upon abandonment. If the deed of a right-of-way is construed as an estate in fee simple, the railroad will retain the right-of-way even after it is no longer used for any transit purposes – effectively severing otherwise contiguous pieces of property, and for no useful purpose.

*Chevy Chase Land*, 733 A.2d at 1064. The *Chevy Chase Land* court recognized that a deed to a railroad purporting to convey a right-of-way may sometimes convey an estate in fee simple but reaffirmed the presumption against a fee: "when a deed conveying a right-of-way fails to express a clear intent to convey a different interest in land, a presumption arises that an easement was intended." *Id.* AT&T has not rebutted that presumption here. The court finds as a matter of law that the granting documents at issue conveyed easements across the parcels identified as Lathrop Parcels 1-6 and 8-11.

Before moving on to the next major issue, the court addresses and rejects several other arguments the County has made in opposition to summary judgment based on the terms of the granting documents. First, the County requested the court to strike Exhibits R, S, T and U because those exhibits were not provided to the County in discovery. AT&T has come forward with evidence that the documents were obtained from a non-party (CSX) from its old property records in Florida. AT&T produced the documents to the County on September 6, 2006. Dkt. No. 157, Ex. CC. The County had a fair opportunity to respond to these documents. The County also requested the court to strike surveyor Leininger's affidavit, which is attached to AT&T's motion as Exhibit W. The County argues that Leininger's affidavit contains expert opinions, but when he was deposed,

Leininger did not indicate that he would be providing such opinions.  See Dkt. No. 144 at 1-2.  The court agrees with AT&T that Leininger's correlation of different land records and maps was not necessarily an expert opinion but can be described fairly as lay opinion testimony.  The County has not actually disputed Leininger's opinions correlating the different records and maps. The County's requests to strike Exhibits R, S, T, U and W are denied.

The County also challenged the validity of Exhibits R, S, T, and U.  The County argued that the Maryland Code requires that deeds be recorded to be valid. See Md. Real Prop. Code § 3-101.  These nineteenth-century documents were not recorded by CSX until October 2006, a few weeks after AT&T produced copies to the County.  Additionally, under current Maryland law, a deed or instrument of conveyance must contain the names of the grantor and the grantee, a description of the property sufficient to identify it with reasonable certainty, and the interest or estate intended to be granted.  Md. Real Prop. Code § 4-101.  Exhibits R, S, T and U, the County argued, do not contain descriptions of the properties the grantors intended to transfer to the railroad, so that the documents cannot constitute deeds or instruments of transfer under Maryland law.  The County argued further that the documents could not convey a fee simple title because they do not contain habendum or granting clauses, which would begin with the language "to have and to hold."

The court finds that Exhibits R, S, T, and U are valid, even though, for reasons explained above, they do not grant fee simple interests for the ten parcels in dispute (Lathrop Parcels 1-6 and 8-11). Any challenge to these exhibits' validity based on a failure to record was mooted when CSX recorded the exhibits in October 2006. Furthermore, whether these documents were recorded or not, they have been effective against Baltimore County and adjoining landowners for many years. Under Maryland law, when a grantee is in possession under an unrecorded deed that is inconsistent with the record title, the grantee's possession gives notice of what an inquiry of the grantee would disclose as to the existence of such unrecorded deed. Md. Code Real Prop. § 3-202. As applied to this situation, in other words, a person looking at the active railway corridor would be on notice, by virtue of the obvious physical presence of the railroad track, that CSX or one of its predecessors had certain rights to the land even if those rights were not formally recorded at the time. Because Maryland is a race-notice state, AT&T's unrecorded interest in the property was therefore effective against Baltimore County as of the date long ago when railroad track was first laid in the railway corridor. See Md. Code Real Prop. § 3-203 (making recorded deed take effect against subsequent grantees having constructive notice of that deed). Upon the later recording of the granting documents, the railroad's interest was made effective against the County from the effective dates on the granting documents. See Md. Code Real Prop. § 3-

201 ("Every deed, when recorded, takes effect from its effective date as against . . . every purchaser with notice of the deed . . . .").[7]

Regarding the County's "metes-and-bounds" argument, at the time the agreements were made, neither the grantors nor the grantee (the railroad) were certain of the precise route the railway corridor would take.  An exact metes-and-bounds description therefore would have been impossible.  But to the extent a description of the property being transferred "sufficient to identify it with reasonable certainty" is required for the documents to be operative under Maryland law, one has existed here for more than 100 years – in the form of the railroad corridor running through the properties.  See *O'Connor v. Baum*, 100 N.E. 581, 582 (Ind. App. 1913) (a railroad right-of-way is a visible monument), citing *Pence v. Armstrong*, 95 Ind. 191, 1883 WL 5823 (1884).

Finally, although the authorities cited by the County certainly recognize the existence of habendum clauses in granting documents, see, *e.g.*, *County Comm'rs of Charles County v. St. Charles Assocs., LP*, 784 A.2d 545, 568-69 (Md. 2001); *Williams v. Skyline Dev. Corp.*, 288 A.2d 333, 341 (Md. 1972); *Hill v. Towson Realty, Inc.*, 157 A.2d 796, 797 (Md. 1960), those cases do not support the County's assertion that the absence of this language necessarily precludes their treatment as deeds or instruments of transfer.  Without such support, this argument fails.

---

[7]The effective date of a recorded deed is the date of delivery, and the date of delivery is presumed the date of last acknowledgment, if any, or the date stated on the deed, whichever is later.  Md. Code Real Prop. § 3-201.

In any event, the County's validity arguments are off-target because the issue here is not the underlying validity of the original grants.  No one seriously disputes the legitimacy of the railroad track's presence on Lathrop Parcels 1-6 and 8-11.  The real question is not whether the railroad had permission from the grantors to build, maintain, and use its track, but how far that permission extends.  If the County wishes to attack the railroad's property rights, perhaps there are (or were) other forums for such claims.  The real issue here is the scope of the easement or right-of-way that was granted to the railroad.

C.     *Scope of the Easement*

AT&T's alternative argument for summary judgment is that even if the railroad had only an easement, the easement was broad enough to allow the railroad to permit AT&T to install its fiber optic cable in the railroad corridor without permission of the owners of the servient estates.

AT&T relies most heavily on *Chevy Chase Land*, which found that the scope of the easement at issue was broad enough to permit the government to convert a railroad corridor into a recreational hiker/biker trail.  In reaching that conclusion, the court looked to the language of the easement itself and found that "nowhere does language 'for railroad purposes' appear, and there are no other express limitations on the use of the right-of-way."  733 A.2d at 1073 (distinguishing the easement from narrower railroad easements), citing *East Wash. Ry. Co. v. Brooke*,

223 A.2d 599, 603 (Md. 1966) (deed language "for railroad purposes" limited scope of right-of-way).  Without such express limitations, the *Chevy Chase Land* court attempted to discern what the parties would have reasonably expected to be giving and receiving when the grant was made, being "generous in its interpretation." 733 A.2d at 1074 (quotation omitted).  Generally, the court instructed that the scope of the easement should be determined from the language of the grant, with any doubtful language "resolved in favor of the grantee, *i.e.*, the railroad." *Id.* AT&T argues that, like the deed construed in *Chevy Chase Land*, the grants in Exhibits R, S, T and U imposed no express limitations on the use of the CSX land corridor, and in particular, did not expressly limit the grant to railroad purposes.

AT&T's argument runs into a major obstacle.  In *AT&T v. Smith*, 18 A. 910 (Md. 1889), Maryland's highest court addressed a question very close to this case, involving overhead telegraph lines rather than buried fiber optic cables. Landowners in *Smith* sought an injunction against AT&T when it began putting up telegraph poles and lines within the railway easement.  The court found that the railway company could use its right of way for its track or any building or structure (including telegraph poles) that "'reasonably tend[ed] to facilitate its business of transporting freight and passengers,'" and in doing so would not exceed the scope of the easement. *Id.* at 912, quoting *Telegraph Co. v. Rich*, 19 Kan. 517 (1878).  In language applicable here, however, the court explained that AT&T was *not* entitled to use the railroad easement to install cables for its general communications network:

If, then, this [telegraph] line is in process of construction . . . over the right of way of this railway company, in good faith, for the use and benefit of the latter in the operation of its road, and to facilitate its business, or is reasonably necessary for that purpose, the land-owners have no ground of complaint, because such use of their land is within the scope of the original easement, for which they have already received compensation.  But, on the other hand, *if this is not the motive for its construction, and the main object in constructing it is to establish an extensive line of telegraph and telephone communication through this and other states, for general commercial purposes*, for the use and benefit of the defendant, and such a line is not reasonably necessary for the purposes of the railroad, *then it will be a new easement, and put a new and additional burden upon the land, for which the owners are entitled to compensation.*

*Id.* at 913 (emphases added).  Ultimately, the *Smith* court found that the line was not being built to serve the purposes of the railroad and thus was an impermissible expansion of the easement.  18 A. 910 at 915-16.

AT&T attempts to distinguish *AT&T v. Smith* by arguing that the easement at issue in that case specified that it was for "railroad purposes."  18 A. at 914.  AT&T contends that the easements at issue here, like the easement in *Chevy Chase Land*, contain no such restriction and therefore should be read broadly.  The court disagrees.

The grants here were grants of permission to construct and use a "road."  The landowners were paid nothing for the rights they gave up, but by the terms of the land grants, received only the benefits that would go along with the "passage" of the road through their lands.  Would the owners have been equally privileged by the "passage" of a utility cable?  Probably not.  Even if these long-dead landowners

could have imagined that the right-of-way would be used for a buried communications cable, it is difficult to conceive that the "passage" of that cable would have been such a boon to them that they would have permitted even the modest additional burden without compensation.

It is true that nothing in the documents specifies that the "road" should only ever be a railway or should be used exclusively for railway purposes. But it is also true that nothing in the land grants suggests that the landowners gave leave for anything other than a means of transport of people or goods (*i.e.*, a "road") to be built on the right-of-way. The encroachment at issue here is not a means of passage of people or goods. It is a fiber optic cable used to facilitate the transmission of information. The question is fairly debatable, but the court finds the better view is that a fiber optic cable is not a reasonable expansion of the meaning of the word "road" under Maryland law. AT&T is not entitled to summary judgment on the ten parcels (Lathrop Parcels 1-6 and 8-11) on the theories that the railroad received title in fee simple or that the installation of the cable is within the scope of the easements granted.[8]

---

[8]In reply, AT&T cited *Turner v. Washington Suburban Sanitary Comm'n*, 158 A.2d 125, 128 (Md. 1960), which noted in dicta that "sewer disposal, through pipes, is itself a form of public transportation," in concluding that a private landowner's rights were not infringed when the sanitary commission installed and maintained a sewer in the bed of a road easement. *Turner* is factually distinguishable. The court found the sewer pipes and their function were necessary for the general public health. *Id.* The same cannot be said for AT&T's fiber optic cable. Also, in *Turner*, the utility was a public commission, not a private for-profit company.

II.      *The "Post-Installation Properties" (Dkt. No. 102)*

AT&T also moves for summary judgment on the ground that, of the twelve properties at issue, the County did not own ten of them at the time AT&T installed the cable.  The properties are those identified as Lathrop Parcels 1-5, 7, and 9-12.  See Dkt. No. 123, Exs. A-C.  Of these ten "post-installation properties," AT&T contends that the owners of three of the properties settled their claims as part of the prior class action before the County acquired the properties.  For the remaining seven properties, AT&T contends that, because the cable was in the ground when the County acquired the property, the County cannot bring a trespass claim.

AT&T's motion is granted with respect to all claims based on the three properties – Lathrop Parcels 7, 10, and 11 – whose prior owners' potential claims were covered by the class action settlement with AT&T.  AT&T is not entitled to summary judgment on this theory with respect to the other seven properties.

A.      *Undisputed Facts*

All twelve properties still at issue in this case are adjacent to the CSX Baltimore-to-Finksburg railway corridor in Baltimore County.  Dkt. No. 104, Exs. A-C (Lathrop Report).  AT&T completed its installation of the cable in the CSX corridor in 1989.  Dkt. No. 104, Ex. D, ¶4 (Slapinski Aff.); Dkt. No. 104, Ex. E, ¶ 4 (Miller Aff.).  At the time of the installation, the County did not own ten of the twelve properties.  (The two exceptions are Lathrop Parcels 6 and 8.)

-22-

Eight of the ten post-installation properties were later conveyed to the County. Those include Lathrop parcels 1-5, 9, and 12. The property known as the "Gwynnbrook" property (Lathrop Parcel 7) was conveyed to the County by deeds dated November 19, 2003. Dkt. No. 104, Ex. B at 3. Two other properties, known as the "Worthington Glen" properties (Lathrop Parcels 10 and 11) had not been conveyed to the County by deed as of the date that Lathrop's report was prepared, or as of the date that AT&T's summary judgment motion was filed. See *id.* at 6-8. Record plats of the Worthington Glen and Gwynnbrook properties were prepared and recorded on March 31, 1989 and November 7, 2001, respectively. Dkt. No. 115, Ex. 1, ¶ 3 (White Aff.).

This court entered its final order and judgment approving the Maryland "Telecommunication Cable" Railroad Corridor Class Settlement Agreement in *Nance v. AT&T Corp.,* 1:99-cv-01892-DFH-TAB on November 7, 2003. Gwynnbrook Development Corp. was notified of its right to opt out of the settlement with regard to the Gwynnbrook properties (Lathrop Parcel 7). NV Land, Inc. was notified of its right to opt out of the settlement with regard to the Worthington Glen properties. Dkt. No. 104, Ex. P, ¶¶ 7-8 (Straup Aff.). Neither entity opted out of the settlement or submitted a claim to the settlement center. *Id.* at ¶¶ 9-10. Baltimore County was not provided with notice of the settlement with regard to the Worthington Glen or Gwynnbrook properties. Dkt. No. 115, Ex. 1, ¶ 5.

The final judgment pursuant to the class settlement released AT&T from any and all claims relating to AT&T's installation of fiber optic cable on property covered by the settlement.  The final judgment also permanently barred class members and their successors in interest from making claims against AT&T relating to property covered by the settlement:

> Each member of the class (and each of their respective successors in interest) is barred and permanently enjoined from instituting, asserting, or prosecuting against AT&T or any Released Party any and all Covered Property Claims, and any and all such claims asserted herein are dismissed with prejudice.

The final judgment also provided:

> As provided in the Settlement Agreement, this Final Order and Judgment provides AT&T with a sixteen and one-half (16½) foot wide easement for telecommunications purposes through the Settlement Corridor (as defined in the Settlement Agreement) vis-à-vis all Current Landowners, as defined in the Settlement Agreement (and their respective successors in interest).

Dkt. No. 104, Ex. O, ¶¶ 5, 7, 8.

B.     *The Gwynnbrook and Worthington Glen Properties*

Wynnbrook Development and NV Land owned the Gwynnbrook and Worthington Glenn properties, respectively, at the time the court approved the class action settlement in *Nance.*  Those entities received proper notice and did not opt out.  In the current suit, the County has brought claims based on the same set of facts as the claims that were asserted on behalf of its predecessors in interest in the *Nance* case that was settled.  AT&T contends that the County, which later

acquired the property deed to the Gwynnbrook property and, as of the time of filing, had not received the deed to the Worthington Glen properties, may not bring claims that are based on the same set of facts as the claims brought and settled by its predecessors in interest.  The court agrees.

The preclusive effect of a judgment is referred to as *res judicata*, which has two components:  claim preclusion and issue preclusion.  *Taylor v. Sturgell*, 553 U.S. 880, — (2008).  Under claim preclusion, "a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'"  *Id.* at —, quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001).  (The issue here is the preclusive effect of a federal court judgment, so federal common law controls.  *Taylor*, 553 U.S. at —, citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507-08 (2001).)  Issue preclusion "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim."  *Taylor*, 553 U.S. at —, quoting *New Hampshire*, 532 U.S. at 748-49.

A person who was not a party to a suit generally has not had a full and fair opportunity to litigate, so *res judicata* applies to non-parties only in limited circumstances.  *Taylor*, 553 U.S. at —.  One recognized exception is where there is a substantive legal relationship between the person to be bound and a party to the judgment, such as prior and successive owners of property.  *Id.* at —, citing D.

Shapiro, *Civil Procedure: Preclusions in Civil Actions* 78 (2001), and Restatement (Second) of Judgments § 43.  Another exception is that "a nonparty may be bound by a judgment because she was 'adequately represented by someone with the same interests who [wa]s a party' to the suit." *Taylor*, 553 U.S. at —, quoting *Richards v. Jefferson County, Ala.*, 517 U.S. 793, 798 (1996).  "Representative suits with preclusive effect on nonparties include properly conducted class actions. . . ." *Taylor*, 553 U.S. at —, citing *Martin v. Wilkes*, 490 U.S. 755, 762 n.2 (1989), superseded by statute on other grounds, 42 U.S.C. § 2000e-2(n).  Because Baltimore County was a successor to Gwynnbrook Development's and NV Land's ownership interest in the Gwynnbrook and Worthington Glen properties, its claims against AT&T for those properties are precluded.

To avoid this result, the County argues that Gwynnbrook Development and NV Land held only "bare legal title" to those parcels at the time of the settlement and that the County was the equitable owner.  Dkt. No. 115 at 4, citing *Wolf Organization Inc. v. Oles*, 705 A.2d 40, 46 (Md. App. 1998) (defendants who had executed a contract to buy real property but had not yet received title in fee simple were not "owners" of the property under Maryland Mechanics' Lien statute, so their "equitable" interest was not subject to mechanics lien).  As the *Wolf Organization* court explained, "A bona fide executory contract for the sale of real property vests equitable ownership of the property in the contract purchaser.  During the executory period, the purchaser owns equitable title to the property and the seller retains bare legal title, which it owns in trust for the purchaser, as security for

payment of the purchase money." *Id.* at 45, citing *DeShields v. Broadwater*, 659 A.2d 300 (1995). No evidence before the court suggests that, at the time of the settlement, either Gwynnbrook Development or NV Land was holding only "bare legal title" in trust for the County. This argument fails.

The County also argues that it had "equitable ownership" of the Worthington Glen and Gwynnbrook properties at the time of the settlement pursuant to plats that had been prepared, filed, and recorded in the Plat Records as required under Maryland Real Property Code § 3-108, which governs the local development permitting process. These plats, the County argues, show that the properties were already dedicated to the County. Two of the four Gwynnbrook property plats – plat two of ten and plat four of ten – that the County submitted to the court as Exhibit 3 are illegible and therefore are not competent evidence to support the County's contention. The other two Gwynnbrook property plats – plat one of ten and plat eight of ten – are barely legible, but the General Notes on them show that they offer certain interests "for dedication to Baltimore County, Maryland." Dkt. No. 115, Ex. 3 at 6, 9. The copies of the Worthington Glen plats are also barely readable but indeed provide under "General Notes":

> Highways and highway widening, slope easements, drainage and utility easements, access easements, and stormwater management areas, no matter how entitled, shown hereon, are reserved unto the owner and are hereby offered for dedication to Baltimore County, Maryland. The owner, his personal representative and assigns shall convey said areas by deed to Baltimore County, Maryland, at no cost.

Dkt. No. 115, Ex. 3 at 3-4.  Based on these notes, the County argues that when the plats were recorded in the plat records and the land was developed by Gwynnbrook Development and NV Land, the developers made an "offer" and the County "accepted" the dedication, so that the County was entitled to exclusive possession of those parcels of land.

The County relies on *Maryland-National Capital Park and Planning Comm'n v. McCaw*, 229 A.2d 584, 589 (Md. 1967), which held that a county became the owner of property dedicated to the county on plat records at the time the plats were recorded.  The flaw in the County's argument is that the court in *McCaw* was construing the statutes of Prince George's County, which provided that Prince George's County accepted the property at the time the plats were recorded. *McCaw*, 229 A.2d at 586, 589.  The Baltimore County Code, on the other hand, provides the contrary:

> (1)   Only the County Executive may accept formal offers of dedication of the public improvements including streets, easements, parks, open space, and other public areas.
>
> (2)   *The recording of a plat does not constitute or imply the acceptance by the county* of any public improvement including streets, easements, parks, open space, or other public areas shown on the plat.

Baltimore County Code § 32-4-271(d) (emphasis added).  In harmony with this provision, the General Notes on the Worthington Glen plats state: "The recording of this plat does not constitute or imply acceptance by the County of any street, easement, par, open space or other public area shown on the plat." Dkt. 115, Ex.

3 at 3-4.  The General Notes on the legible Gwynnbrook plats contain virtually identical language.  *Id.* at 6, 9.

Even assuming that the illegible Gwynnbrook plats do not contain similar language (though it is likely that they do, as required by the Baltimore County Code), the County's argument still fails as a matter of law.  "The presence of an offer to dedicate is only half the equation.  There must also be acceptance." *Windsor Resort, Inc. v. Mayor and City Council of Ocean City*, 526 A.2d 102, 107 (Md. App. 1987).  Here, the County executive accepted the dedication for the Gwynnbrook Property on April 28, 2004 – five months *after* entry of the Nance final judgment.  There is no evidence before the court that the County executive has ever accepted the dedication of the Worthington Glen Property.  Accordingly, AT&T's motion for summary judgment is granted with regard to the Gwynnbrook and Worthington Glen Properties, *i.e.*, Lathrop Parcels 7, 10, and 11.

C.    *Trespass Claims on Other Post-Installation Properties*

Regarding the remaining seven post-installation properties (Lathrop Parcels 1-5, 9, and 12), AT&T argues that the County has no right to bring a trespass claim because the County did not own those properties at the time the cable was installed.  This argument depends on the sometimes subtle distinction between permanent trespasses and continuing trespasses.  See generally W. Page Keeton *et al.*, *Prosser & Keeton on the Law of Torts* § 13, at 83 (5th ed. 1984).  AT&T relies

on the Restatement (Second) of Torts, which provides that where a trespass "permanently changes the physical condition of the land" by "destroy[ing] or remov[ing] a structure," "dig[ging] a well or mak[ing] some other excavation, or remov[ing] earth or some other substance from the land," "the [present] possessor's right is to full redress in a single action for the trespass, and a subsequent transferee of the land, as such, acquires no cause of action for the alteration of the condition of the land."  Restatement (Second) of Torts § 162, Comment E; see also Charles T. McCormick, *Damages for Anticipated Injury to Land*, 37 Harv. L. Rev. 574 579-80, n. 9 (1924) (noting that in a permanent trespass action, only the owner at the time of the original wrong may bring the action – not a subsequent purchaser).

The County points out that Maryland has not adopted the Restatement, and the County in any event relies on the concept of continuing trespass.  Comment D to the same Restatement section explains:

> If the conduct of the actor is a continuing trespass, any person in possession of the land at any time during its continuance may maintain an action for trespass.  Thus, if the possession of land upon which the actor has tortiously erected a structure is transferred while the structure remains there, the person in possession of the land at the time of such entry has a cause of action in trespass for the entry as well as for the continuance of the trespass until the time when such person transferred his possession, *and the transferee of the possession has a cause of action for the actor's wrongful continuance of his trespass after the possession of the land was acquired by such transferee.*

Restatement (Second) of Torts § 162, Comment D (emphasis added).  Although this comment refers only to structures, the relevant reporter's note cross-references

another section of the Restatement defining a continuing trespass as "the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there."  Restatement (Second) of Torts § 161(1).

In this case, whether the County, which acquired these properties after the cable was installed, can sue for the alleged wrong depends on whether AT&T's underground cable installation would be deemed a "permanent" trespass or a "continuing" trespass (assuming it was wrongful at all).  Aspects of each kind of trespass are present here.  The cable is certainly a "thing" still present on the land (implying continuity), but the cable's placement involved an "excavation" of sorts (implying permanence).  Maryland law has not addressed this question directly.

In the court's view, the Maryland courts would likely treat this case as one of continuing trespass.  The critical fact is that AT&T's ongoing use of the cable requires not just the one entry for the cable's original installation but would almost certainly involve additional entries to repair, replace, and maintain the cable.  See *Sexton v. Mason*, 883 N.E.2d 1013, 1019 (Ohio 2008) (holding that one-time trespass causing annual flooding downstream was only a permanent trespass; "defendant's ongoing conduct or retention of control is the key to distinguishing a continuing trespass from a permanent trespass"); *Carpenter v. Texaco, Inc.*, 646 N.E.2d 398, 399 (Mass. 1995) (stating that "a continuing trespass . . . must be based on recurring tortious or unlawful conduct"); *Breiggar Properties, L.C. v. H.E. Davis & Sons, Inc.*, 52 P.3d 1133, 1135 (Utah 2002) (holding that one-time act

-31-

of dumping debris on property was a permanent trespass: "We characterize a trespass as 'permanent' to acknowledge that the act or acts of trespass have ceased to occur.  We characterize a trespass as 'continuing' to acknowledge that multiple acts of trespass have occurred, and continue to occur . . . .").[9]  The need for maintenance distinguishes this buried cable from permanent trespasses in which there is a one-time entry causing damage to or alteration of the property, followed by no further activity by the defendant.  See *Sexton*, 883 N.E.2d at 1019 ("A permanent trespass occurs when the defendant's allegedly tortious act has been fully accomplished."); Restatement (Second) of Torts § 162, Comment E (noting that permanent trespass involves "conduct [that] has *once for all* produced a permanent injury to the land" (emphasis added)).  Assuming for purposes of argument that the County's trespass claim is otherwise viable for a given parcel, the better view under Maryland law is that the installation and maintenance of buried cables is a continuing trespass, at least as long as the company operating the cable intends to and claims the right to maintain and repair or replace the cable.  AT&T is not entitled to summary judgment on this basis with respect to Lathrop Parcels 1-5, 7, and 12.

AT&T's motion for summary judgment (Dkt. No. 201) is granted with respect to the Gwynnbrook properties (Lathrop Parcel 7) and the Worthington Glen

---

[9]The Maryland courts have recognized an analogous principle, termed the "continuing harm" or "continuous violation" doctrine, that tolls the statute of limitations in the case of repeated violations.  *MacBride v. Pishvaian*, 937 A.2d 233, 240 (Md. 2007).

properties (Lathrop Parcels 10 and 11), and denied with respect to the other post-installation properties.[10]

III.   *Evidence of Actual Encroachment (Dkt. No. 128)*

AT&T has also moved for summary judgment on the County's claims on the theory that the County cannot establish that AT&T's underground cable actually encroaches on any property owned by the County.  The cable runs along only one side of the railroad tracks.  If the County's property does not include the side of the tracks where the cable is installed, then the County has no claim.   This motion applies to Lathrop Parcels 1-10 and 12 of the Lathrop Report.[11]  AT&T's motion on this issue is denied without prejudice to renewal after a brief opportunity for discovery that should resolve the issue definitively.  This is an issue that should be resolved on the basis of physical inspection and physical evidence rather than the guesswork that is now in the record.

A.   *Facts for Summary Judgment*

The installation of the AT&T fiber optic telecommunications cable in the CSX corridor in Baltimore County was completed in 1989.  Dkt. No. 130, Ex. A, ¶ 6

---

[10]For the reasons noted in Part I-A above, this motion is moot as to Lathrop Parcel 12.

[11]Again, for the reasons discussed in Part I-A, this motion is moot as to Lathrop Parcel 12, and for the reasons discussed in Part II, it is also moot as to Lathrop Parcels 7 and 10.  Even this motion were not moot in part, it would not apply to Parcel 11 because the County owns the land on both sides of the rail corridor there (Worthington Glen Section 8).  See Dkt. No. 129 at 8, n.3.

(Dougherty Aff.).  Michael Dougherty was employed by AT&T from 1964 to 1990. Dougherty Aff. ¶ 3.  In the 1980s, Dougherty worked as either an engineering supervisor or an engineering staff supervisor for AT&T and had engineering responsibilities in Maryland, including the Baltimore-to-Finksburg CSX railroad corridor in Baltimore County on which AT&T's fiber optic cable was installed. Dougherty Aff. ¶ 3; Dkt. No. 130, Ex. R. at 7 (Dougherty Dep.).  The contractors used a rail plow to install the fiber optic cable.  Dkt. No. 130, Ex. S, ¶ 4 (Slapinski Aff.).  The rail plow was placed on a railroad car and had a large mechanical arm that went into the ground along the rails and plowed as the rail car moved down the tracks.  Slapinski Aff. ¶ 4.  The plow normally reached seven feet laterally beyond the rail.  Dougherty Dep. at 53-54.

During the installation of the fiber optic cable along the CSX corridor, AT&T prepared as-built drawings showing the approximate location of the cable in relation to the railroad tracks.  Dougherty Dep. at 129-30, 132, 165-66.  Sheets 3 through 13 of 15 of the AT&T as-built drawings show the installation of the fiber optic cable along the CSX corridor through Baltimore County.  Dougherty Dep. at 107-08; see also Dkt. No. 130, Ex. T (Sheets 3 through 13 of 15 as-built drawings). The far left column of the AT&T as-built drawings ("Table A") reflects the location of the cable as measured from the near rail of the CSX railroad tracks.  Dougherty Dep. at 118, 129-30, 132; Dkt. No. 130, Ex. T.  The term "offset" used in Table A means the distance from the cable to the near rail, either to the left side or the right side of the railroad tracks. Dougherty Dep. at 129.  The AT&T as-built

drawings do not show the location of the cable in relation to the centerline of the tracks or to the centerline of the CSX railroad corridor.  Dougherty Dep. at 51-55, 132.

The County intends to rely on the expert testimony of Wendy Lathrop, a professional land surveyor, regarding the location of AT&T's underground fiber optic cable along the CSX rail corridor in relation to County-owned property.  Dkt. No. 130, Ex. Q (Lathrop Dep.).  Lathrop has opined that the AT&T fiber optic cable was buried in the twelve parcels of land at issue.  Dkt. 104, Exs. A-C (Lathrop Report).  In forming her opinions, Lathrop relied upon railroad valuation maps that depict the outer boundaries of the railroad corridor right-of-way.  Dkt. No. 130, Ex. Q at 107; Dkt. No. 130, Exs. U-X (Right-of-Way and Track Maps of Western Maryland Railroad Company (now CSX Transportation) numbered V.1-1/8, V.1-1/7, V.1-1/9, and V.1-1/5) (collectively, the "valuation maps").  The railroad valuation maps on which Lathrop relied depict a baseline running between the right-of-way boundaries.  Dkt. No. 130, Ex. Q at 107-08.  The baseline is a line of reference from which the railroad makes all of its measurements, but it is not necessarily where the tracks are located.  Dkt. No. 130, Ex. Q at 136-37.

Lathrop admitted that she did not know how the AT&T as-built drawings were prepared.  Dkt. No. 130, Ex. Q at 92.  Lathrop believed that the acronyms "LOEC" and "ROEC" seem to mean "left of easement center" and "right of easement center," and she admitted that the numbers on Table A were not set up in

accordance with the location of the center of the CSX railroad corridor easement. Dkt. No. 130, Ex. Q at 128.  She interpreted Table A on the AT&T as-built drawings as showing that the cable was offset a certain number of feet from the baseline or reference line on the railroad valuation maps, and not from the center of the railroad corridor easement.  See Dkt. No. 130, Ex. Q at 114, 126-28, 130-31.

In making her report, Lathrop relied on the documents the County provided and did not physically inspect the twelve land parcels at issue.  Dkt. No. 104, Ex. A at 1 (Lathrop Report); Dkt. No. 130, Ex. Q, at 73, 78.  Lathrop did not know the exact location of AT&T's cable.  Dkt No. 130, Ex. Q at 83-84.  Lathrop did not review any deposition testimony given by witnesses in this case, including Dougherty.  Dkt. No. 130, Ex. Q at 125.

B.    *The Actual Encroachment Issue*

Each of the County's claims hinges on whether the cable is actually buried on its property.  The County claims an ownership interest in only half of the railroad corridor that borders on the Lathrop Parcels (other than No. 11).  Some of the County's claimed land lies on one side of the rail corridor, some on the other. AT&T argues that the County cannot meet its burden of proving that the cable was installed through the County's side of the railroad corridor.  Specifically, AT&T attacks Lathrop's opinion, alleging that she has not determined the precise location of the fiber optic cable within the CSX railroad corridor and cannot know with confidence that the cable runs through the County's property.

AT&T's argument, in essence, is that Lathrop cannot testify as to the location of the tracks within the corridor – whether, for example, the tracks are on the far side of the corridor from the County's property, whether the tracks are in the center of the corridor, or whether the tracks run on the half of the corridor closest to the County's property – and that without knowing where the tracks run, knowing that the cable was installed within seven feet to the left or right of the near rail of the track does not meet the County's burden of proof.  AT&T hypothesizes that, if the railroad tracks lie seven feet or more from the County's property, then the plow's mechanical arm with its seven-foot reach could not have dug the trench for the cable within the County's property, and Lathrop's methodology does not foreclose that possibility.

AT&T has presented no evidence to demonstrate that the tracks actually lie far enough away from the County's property to undermine its claims.  At trial, the County will have the burden of proving the location of the cable.  If there simply is no evidence either way other than guesswork, the County will lose.  Cf. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (summary judgment may be granted against party with burden of proof on issue if there is no evidence to meet burden).  But a district court may manage discovery in relation to summary judgment.  The fact that the parties have even been having this expensive and abstract debate between lawyers and experts is hard to understand.  AT&T ought to know where its cable is.  In fact, AT&T says that it knows (or is able to ascertain readily) where the cable is located:  its signs in the railroad corridor warn against digging and invite calls:  "FOR FREE LOCATION, CALL 1-800-257-7777."  See Dkt. No. 123, Ex. Q, ¶ 6 (Miller Aff.).  (It is unclear whether the County has called for the "free location" as part of this lawsuit.)

The County is not entitled to enter the railway corridor and to start digging or even probing to find the cable, at least not without consent or court supervision.  (The court will happily provide authority and supervision so that this issue can be resolved definitively.)  If the County's claims have significant monetary value, that digging or probing may become necessary in those parcels where the County's claims otherwise survive summary judgment, and if AT&T cannot provide reliable evidence itself.  As an exercise of its power to supervise discovery, and in the interests of resolving this issue on the merits rather than by default rules, the

court declines to grant summary judgment at this time to give the County a further opportunity to conduct discovery to determine the actual location of the cable. AT&T's motion with regard to encroachment into Lathrop Parcels 1-6 and 8-9 (Dkt. No. 128) is denied without prejudice to renewal after further discovery on this elementary question.  With regard to Lathrop Parcels 7, 10, and 12, AT&T's motion is denied without prejudice as moot.[12]

IV.    *Possession (Dkt. No. 33)*

AT&T also moves for summary judgment on the theories that the County is not entitled to possession of the railroad right-of-way and that AT&T itself also is not entitled to possession.  From each of these premises, AT&T argues that there can be no viable claim for trespass or for ejectment, even if AT&T's installation of the cable was beyond the scope of the railroad's power to authorize and in violation of the County's rights.[13]

---

[12]AT&T has raised an issue specific to the location of the cable in Lathrop Parcel 7, also known as the Gwynnbrook property.  Dkt. No. 129 at 14-16. Because the court grants summary judgment for AT&T on Parcel 7 on other grounds (claim preclusion based on the class action settlement),this issue is moot.

[13]This motion is also moot as to Lathrop Parcels 7, 10, 11, and 12.

A.     *The County's "Possessory" Interest*

AT&T asserts that a trespass claim may be asserted only by a party that is in actual possession of the property.  See *McAuliffe v. Lerch*, 57 A.2d 329, 330 (Md. 1948) ("The holder of a perfect paper title who is not in possession cannot maintain trespass.").  Also, AT&T contends that the County, to maintain a claim for ejectment, would need to establish that it has the right to immediate possession of the right-of-way.  See *Laney v. State*, 842 A.2d 773, 783 (Md. 2004) (noting that the right to possession is a prerequisite for ejectment action); *Janoske v. Friend*, 275 A.2d 474, 477 (Md. 1971) (same).  AT&T argues that the railroad has all rights to possession of the right-of-way and the County has none, and concludes that the County's trespass and ejectment claims must be dismissed.  The court views Maryland law on these questions as less certain under the circumstances of this case, involving railroad right-of-way easements, and quotations taken out of context do not easily resolve the questions.

AT&T relies on *Chevy Chase Land* for its assertion that, even if the railroad has only an easement, "a railroad easement carries with it the right to exclusive possession, which 'exclude[s] use of the easement by the owner of the servient tenement.'"  Dkt. No. 34 at 14, quoting 733 A.2d at 1078.  The court was commenting on the general recognition of the exclusivity of railway easements in support of its specific determination that the proposed hiker/biker trail and light rail system at issue in that case would not impose a new burden on the servient

estate because the corridor's prior use as a railway was considerably more burdensome. *Id.* Assuming the exclusive nature of the easement, the court stated, "the change in use in this case actually decreases the burden on the servient tenement because, *inter alia*, the shift is from an exclusive to a non-exclusive use." *Id.* Using as its major premise the language of *McAuliffe* requiring the plaintiff to be in possession and as its minor premise the language of *Chevy Chase Land* stating that a railroad easement gives the railroad exclusive possession, AT&T completes the syllogism by asserting that an owner like the County cannot assert any trespass claim based on alleged misuse of the railroad easements.

The major and minor premises take language out of context and oversimplify a more difficult problem. For example, in addition to the quoted language in *McAuliffe*, other Maryland cases indicate that in other circumstances, an owner of property need not be in possession to sue for trespass. See *Miller v. Miller*, 41 Md. 623, 1875 WL 4886, at *5 (1875) (owner of unimproved and unoccupied land will be deemed in possession for purpose of trespass action); *Gent v. Lynch*, 23 Md. 58, 1865 WL 1945, at *4 (1865) (actual or constructive possession is sufficient). And the County quotes another broad statement of Maryland law to the effect that an easement is a nonpossessory interest in the real property of another. *Stansbury v. MDR Development, L.L.C.*, 871 A.2d 612, 621 (Md. App. 2005), citing *Boucher v. Boyer*, 484 A.2d 630, 635 (Md. 1984). Those cases did not address the special case of railroad easements, but they provide fodder for debate.

The broad language about railroad easements in *Chevy Chase Land* quoted by AT&T did not address the right of an adjoining landowner to subsurface rights, which may be relevant to this case of buried cable. Such issues of subsurface rights have arisen often with railroad easements. This court reviewed some of these issues as part of this MDL proceeding in *Home on the Range v. AT&T Corp.*, 386 F. Supp. 2d 999, 1010-16 (S.D. Ind. 2005). That discussion addressed the issue in the context of federal land grants for railroads in the American West, but the cases discussed there show that an owner in fee (the United States government) may grant a railroad easement without surrendering subsurface rights. See, *e.g.*, *Great Northern Ry. Co. v. United States*, 315 U.S. 262, 279 (1942) (government retained mineral rights beneath railroad right-of-way); *United States v. Union Pacific R.R. Co.*, 353 U.S. 112, 120 (1957) (holding that right-of-way granted under 1862 Union Pacific Act did not include subsurface mineral rights). Broad language relevant to surface rights does not necessarily resolve subsurface rights.

Assuming that AT&T's installation of its cable was beyond the power of the railroad to authorize without violating the rights of the fee simple owner, the court is not persuaded that Maryland law would block the owner from bringing suit for trespass or ejectment based on the theory that the fee simple owner had no right of possession. If AT&T were right, the owner of the servient estate would never have any ability to challenge an excessive use of a railroad right-of-way, a view that seems both improbable and inconsistent with the ability of owners to challenge the installation of AT&T's telegraph wires in a railroad right-of-way in *AT&T v. Smith*,

18 A. 910 (Md. 1889) (in lawsuits by owners of servient estate, holding that installation of telegraph wires for general communication network was impermissible expansion of easement).[14]

B.      AT&T's "Possessory" Interest

AT&T also argues that the County's ejectment claim fails because the County cannot prove that AT&T itself possesses the right-of-way where the cable was buried. AT&T relies on a definition of "ejectment" as "an action filed by a plaintiff who does not possess the land but has the right to possess it, against a defendant who has actual possession." Dkt. No. 34 at 15, citing 25 Am. Jur. 2d Ejectment § 1. So, AT&T argues, to prevail the County must prove that AT&T retains possession of the right-of-way. Dkt. No. 34 at 15. AT&T relies on *Blevins v. Mullan Contracting Co.*, 201 A.2d 348, 351 (Md. 1964), which held that a plaintiff's allegations that defendants entered upon land to which she had title and graded and surfaced it with asphalt, black top, and crushed stone, but in doing so had come and gone, were insufficient to allege ejectment, which requires a showing that the defendants ejected plaintiff or that they retained possession. But the *Blevins* court was not faced with the question whether the defendants' actions would have amounted to "possession" sufficient to satisfy the plaintiff's ejectment claim if, for

---

[14]Much of the discussion in *Smith* addressed the issue of compensation for the property owners because AT&T could have exercised a power of eminent domain to condemn the needed rights. The court clearly assumed, however, that the owners had a right to seek an injunction (presumably for ejectment) for the improper expansion of the use of the railroad easement.

instance, the defendants had continually entered the plaintiff's land over time to maintain and protect the road, rather than entered only for so long as it took to surface the road and then left for good.

It appears from the cases that in Maryland, the "possession" required for an ejectment claim is the continued presence of the defendant on the plaintiff's property.  In *Fett v. Sligo Hills Development Corp.*, 172 A.2d 511, 512 (Md. 1961), a housing developer promised to sell a home to one of its employees, and the employee and his family moved in.  After the employee died, the housing developer brought an action for ejectment against the employee's widow and children.  The court found that the promise was unenforceable and that ejectment was the proper remedy against the widow and her children, who were deemed to be trespassers. *Id.* at 513-14; see also *Metromedia Co. v. WCBM Maryland, Inc.*, 610 A.2d 791, 793-94 (Md. 1992) (discussing *Fett* for the appropriate amount of damages in an ejectment action).

In this case, the facts remain that AT&T's cable is buried in the railroad right-of-way and that AT&T signs are posted along the right-of-way announcing the presence of the cable.  The court must assume that AT&T enters onto the land from time to time to maintain the cable.  If that cable were at risk of being cut or were damaged, AT&T would take steps to protect or repair it.  At this stage of the proceedings, when all factual issues must be construed against AT&T and in favor of the County, the continued presence of AT&T's underground cable and signs and

AT&T's ongoing maintenance and protection of that underground cable are sufficient to defeat AT&T's argument that it is not in possession of the right-of-way where the cable was buried.  AT&T is not entitled to summary judgment on the ejectment claim on the theory that AT&T is not in possession of the property.

V.      *Statute of Limitations (Dkt. No. 33)*

AT&T also seeks summary judgment on the theory that the County's claims are barred by the applicable statutes of limitations.  Summary judgment on this theory is also denied.

A.      *Undisputed Facts*

AT&T installed the cable under the CSX corridor in Baltimore County in 1989.  Dougherty Aff.  ¶¶ 5-6; Dkt. No. 35, Ex. C, ¶ 5 (Chaney Aff.).  In 1989, AT&T installed above-ground marker poles and signs along the entire CSX corridor so that anyone standing anywhere along that corridor could see two poles.  Dkt. No. 35, Ex. D, ¶ 5 (Slapinski Aff.); Ex. E, ¶ 5 (Miller Aff.); Ex. B, ¶ 6 (McCauley Aff.). The signs on the marker poles stated:  "WARNING:  Buried fiber optic cable in this vicinity," with instructions to contact AT&T in an emergency.  Slapinski Aff. ¶ 6; Miller Aff. ¶ 6; Chaney Aff. ¶ 8; Dkt. No. 35, Ex. F, ¶ 8 (Baronner Aff.); Mccauley Aff. ¶ 5, sub-exs. 1-3.  The signs were installed to inform anyone who might do any digging in the area to call first.  Dkt. No. 56, Ex. 15 at 50-51, 70-71 (Baronner Dep.).  The installed signs faced the railroad track.  Baronner Dep. at 40, 82.

AT&T has maintained the marker poles and signs, and the corridor itself is maintained by the railroad.  Chaney Aff. ¶ 11; Baronner Aff. ¶ 10; Forton Aff. ¶ 9; Miller Aff. ¶ 7; Dkt. No. 34, Ex. H, ¶¶ 5-7 (Flinkstrom Aff.).  The County does not allege that it maintained or managed the CSX corridor.

B.      *The Statute of Limitations Defense*

AT&T argues that the County's trespass and unjust enrichment claims are subject to a three-year statute of limitations that began running when the causes of action accrued.  See *Levin v. Friedman*, 317 A.2d 831, 835 (Md. 1974).  It argues that in Maryland, trespass and unjust enrichment claims accrue when the plaintiff "in fact knew or reasonably should have known of the wrong."  See *Poffenberger v. Risser*, 431 A.2d 677, 680 (Md. 1981).  In other words, the statute of limitations would have begun to run when the County had "knowledge of circumstances, which would cause a reasonable person in [the County's position] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged cause of action."  *Bank of New York v. Sheff*, 854 A.2d 1269, 1275 (Md. 2004) (internal quotation and alteration omitted).   Under Maryland law, a plaintiff has sufficient knowledge to start the clock when the facts and circumstances would have "prompt[ed] a reasonable person to inquire further." *Pennwalt Corp. v. Nasios*, 550 A.2d 1155, 1163 (Md. 1988).  Such knowledge can be "express, based on direct evidence, or implied based on circumstantial evidence."  *Benjamin v. Union Carbide Corp.*, 873 A.2d 463, 475 (Md. App. 2005).

AT&T installed warning signs along the CSX railway corridor in 1989.  If the clock began to run in 1989, then time ran out even before the first national class action complaint filed in 1996 could have tolled the statutes until the County filed its own complaint in November 2003.

        The court rejects the statute of limitations defense for two reasons.  First, the County correctly argues that the alleged trespass here is a continuing trespass, so that the statute of limitations has not expired.    The County relies on the Restatement (Second) of Torts § 161(1) for this argument, which states that a trespass "may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there, whether or not the actor has the ability to remove it."  This argument echoes the earlier discussion of the difference between a continuing trespass and a permanent trespass.  Prosser and Keeton explain:

> The ordinary trespass is complete when it is committed; the cause of action accrues, and the statute of limitations begins to run at that time, although the consequence may be a permanent injury to the land.  But in many cases, as where the defendant erects a structure or dumps rubbish upon the land of the plaintiff, the invasion is continued by a failure to remove it.  In such a case, there is a continuing wrong so long as the offending object remains.

W. Page Keeton, *et al.*, *Prosser and Keeton on the Law of Torts* § 13, at 83 (5th ed. 1984) (footnote omitted).  The running of the statute of limitations depends upon the nature of the trespass.    The court views the alleged trespass here as a continuing trespass, as discussed above in Part II-C.  AT&T did not make only a

one-time entry that changed the land or destroyed a structure once and for all.  It entered the property and installed equipment that must be monitored and repaired, involving repeated entry into the property.  See *MacBride v. Pishvaian*, 937 A.2d 233, 240 (Md. 2007) (noting that the occurrence of continuous violations tolls the statute of limitations).

Second, even if this were a permanent trespass, there is a genuine issue of fact:  when the County reasonably should have known of the AT&T cable installation.  Under *Poffenberger*, 431 A.2d at 680, the operative question is when a person in the County's position "reasonably should have known" of the presence of AT&T's buried cable.  When should a reasonable landowner have noticed AT&T's signs?  There is no question that those signs would inform a reader of the presence of AT&T's buried cable, but the signs faced the railroad tracks and were intended to protect the cable from being cut or otherwise damaged by railroad work crews.

AT&T argues that the County's claim accrued when it placed its warning signs along the railroad corridors because a reasonable owner of property "periodically inspects the property, and even a cursory inspection would have detected the poles and signs announcing the presence of AT&T's buried cable." Dkt. No. 34 at 9, citing *Marvel v. Barley Mill Road Homes, Inc.*, 104 A.2d 908, 911 (Del. Ch. 1954).  In ordinary cases, this reasoning might be more persuasive, but the facts here are unusual.  The signs were installed facing the track, requiring anyone reading them to be on or near the tracks themselves.  Under Maryland

criminal law, it would have been a misdemeanor for anyone other than railroad work crews to trespass on railroad property so that they could have been in a position to read the signs.  See Md. Code Ann., Crim. Law § 6-503(d).  What is a reasonable Maryland landowner to do when she would have to commit criminal trespass to inspect her own property?  The court doubts that the Maryland courts would apply the general principle of constructive notice to circumstances in which actual notice could be acquired only by committing a crime.  AT&T's motion for summary judgment on statute of limitations grounds is denied.[15]

VI.   *The County's Franchise Ordinance and Claims – Damage Limits and Preemption (Dkt. No. 33)*

AT&T also moves for summary judgment on the County's unjust enrichment claim based on the County's contention that it is entitled to collect franchise fees on AT&T's buried cable.  The County contends that one element of its damages on its unjust enrichment claim is that AT&T has not paid a required franchise fee for use of a public highway.  AT&T argues that the County has no right to impose a franchise fee on it.  The court concludes that the County is not entitled to a franchise fee as part of any damages it might collect in this case.  The County's franchise ordinance simply does not apply to the private arrangement between AT&T and CSX for use of the railroad corridor.  Even if the ordinance did apply,

---

[15]The court does not reach the County's reliance on the common law doctrine of *nellum tempus occurrit regi*, translated as "time does not run against the king," which stems from principles of sovereign immunity.  See *Anne Arundel County v. McCormick*, 594 A.2d 1138, 1141-42 (Md. 1991); *Central Collection Unit v. Atlantic Container Line, Ltd.*, 356 A.2d 555, 557 n.3 (Md. 1976).

principles of preemption would prevent the County from winning more than modest damages on such a theory.

When the Bell System was divested in 1984, various corporate rights and assets were divided among the local Bell companies and the newly created AT&T entities, in accordance with the Plan of Reorganization.  Dkt. No. 35, Ex. K (the Plan).  The Chesapeake and Potomac Telephone Company of Maryland transferred various rights, including franchise rights, to AT&T Communications of Maryland, Inc., which later merged into AT&T Communications of Maryland, LLC.  Dkt. No. 35, Ex. M ¶¶ 4-6 (Thomson Aff.), Sub-exs. 1-2.  Among the rights transferred was the Chesapeake and Potomac Telephone Company's statewide franchise to lay telecommunications lines on roads, streets, and highways in the State of Maryland, including its counties.  See Thomson Aff. ¶ 5, Sub-exs. 1-2.

Baltimore County has not entered into any franchise agreements with AT&T or any other any telecommunications company pertaining to those companies' telecommunications facilities on any railroad corridor in the County, nor has it received any franchise fees paid by any telecommunication company pertaining to that company's railroad corridor facilities.  Dkt. No. 35, Ex. J at 19, 20 (Plaintiff's Response to Defendants' First Set of Requests for Production of Documents).

A.    *Right-of-Way as Public or Private Property*

AT&T argues first that the County has no right to impose a franchise fee on its use of the railway right-of-way because the right-of-way is private rather than public.  AT&T relies on *Western Union Telegraph Co. v. Pennsylvania R.R. Co.*, in which the Supreme Court wrote:

> The right of way of a railroad is property devoted to a public use, and has often been called a highway, and as such is subject to a certain extent, to state and Federal control; and for this many cases may be cited.  But it has always been recognized, as we have pointed out, that a railroad right of way is so far private property as to be entitled to that provision of the Constitution which forbids its taking, except under the power of eminent domain and upon payment of compensation.

195 U.S. 540, 573 (1904).  Based on this language, AT&T urges the court to find that the CSX railroad right-of-way is not "public" and that the County may not charge a franchise fee for its use for telecommunications.  The court agrees.

Section 3-9-201(a) of the Baltimore County Code authorizes the County to grant a franchise:  "The county administration may grant a franchise on, above, or below the surface of a highway, avenue, street, lane, or alley as provided in this subtitle."  The County asserts that the franchise law dates back to approximately 1886.  The County argues that even a privately owned railroad corridor is considered a "highway" under Maryland law, citing *Chevy Chase Land*.  In fact, the Maryland court said in that case:  "We have long considered a railroad line as *analogous to* a public highway."  733 A.2d at 1075 (emphasis added).  The court did not say that a railroad line is a public highway, though it noted that railroads with common-carrier obligations were required to make their facilities available to the

public (in return for appropriate fees).  *Id.*  The court then used the analogy to support its use of public highway cases to construe documents granting a general use right of way to a railroad.

The *Chevy Chase Land* court's use of the analogy falls well short of showing that Maryland law treats a railroad right-of-way as a highway for all purposes, let alone that a county franchise law authorizes regulation of one private entity's use of another private entity's property by agreement.  The County has not come forward with evidence that it has applied, or that courts have agreed to apply, the county franchise law to these or similar private arrangements.  The court finds in this case that the County is not entitled to a franchise fee as part of any damages it might collect.[16]

   B.     *Preemption*

Even if the Baltimore County Code may be read to authorize a franchise fee for use of the private railroad right-of-way, federal principles of preemption would prevent the award of all but modest damages on the franchise-fee theory.  The Baltimore County Code permits the County administration to "grant a franchise on, above, or below the surface of a highway, avenue, street, lane, or alley," but only after the county administration makes "a diligent inquiry regarding the value of the proposed franchise and the adequacy of the compensation proposed to be

---

[16]It is a further mystery why the County should be able to apply a franchise fee, even under its own theories, to any of the ten properties – Lathrop Parcels 1-5, 7, and 9-12 – that the County acquired after AT&T had already installed its cable in the railroad right-of-way.

paid for the franchise." Baltimore County Code § 3-9-201(a),(b).  After time to file objections to the proposed franchise and a hearing, the county administration "*may* grant the franchise."  *Id.* at § 3-9-201(f) (emphasis added).

AT&T argues that Baltimore County's ordinance exceeds the limitations of the Federal Telecommunications Act.  The preemption provision of the Federal Telecommunications Act states:

> (a)    In general
> No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.
>
> . . . .
>
> (c)    State and local government authority
> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253.  The federal act prohibits state and local regulation that impedes the provision of telecommunication service.  *Verizon Communications, Inc. v. F.C.C.*, 535 U.S. 467, 491 (2002).  Under the federal act, a local government is permitted to manage telecommunications carriers' use of public rights-of-way and to require fair and reasonable compensation from providers of telecommunications services on a competitively neutral basis for use of the public right-of-way, 47 U.S.C.

§ 253(c), but the local government's action may not prohibit or have the effect of prohibiting telecommunications service, *id.* § 253(a).

The County argues that AT&T has misunderstood the premise of its unjust enrichment claim.  Dkt. No. 54 at 39.  With its unjust enrichment claim, the County claims to seek the profits that AT&T gained "as a result of its wrongful conduct."  *Id.*  The franchise fee, the County states, is "but a part of consequential damages for ignoring Baltimore County franchise law that has existed since 1886." *Id.* at 40.  The County argues that it has been explicitly granted the authority to grant franchises, that its franchise law predates telecommunications networks by 100 years, and that its franchise law has not been modified either before or after the advent of fiber optics.  *Id.* at 43-44.  The County insists that its ordinance does not attempt to regulate telecommunications.  *Id.* at 44, quoting *Bell Atlantic-Md., Inc.*, 155 F. Supp. 2d at 478.  The County's only interest, it claims, is "to know what is buried and where."  Dkt. No. 54 at 44.  It "submits its franchise law is the least demanding in the United States," particularly compared to the franchise ordinance in *Bell Atlantic-Md. Inc. v. Prince George's County*, the first section of which "contains thousands of words."  *Id.*, citing 49 F. Supp. 2d 805, 808-12 (D. Md. 1999) (considering federal FTA preemption of local franchising ordinance).

In general, there are three recognized types of federal and state preemption of local law:  express, field, and conflict preemption.  *Hoagland v. Town of Clear Lake*, 415 F.3d 693, 696 (7th Cir. 2005), citing *Boomer v. AT&T Corp.*, 409 F.3d

404, 417 (7th Cir. 2002).  The court reads AT&T's argument as asserting a form of conflict preemption, which arises when it is either "impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002), quoting *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287 (1995) (internal citations and quotation marks omitted); see also *Talbot County v. Skipper*, 620 A.2d 880, 882 n.4 (Md. 1993) ("A local ordinance is pre-empted by conflict when it prohibits an activity which is intended to be permitted by state law, or permits an activity which is intended to be prohibited by state law.").  There is a general presumption against preemption because, unless the need for preemption is clear, the analysis starts with the basic assumption that Congress did not intend to displace state law.  See *Geier v. American Honda Motor Co.*, 529 U.S. 861, 885 (2000); *Building and Constr. Trades Council of Metro. Dist. v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 224 (1993).

If any portion of the County's case ultimately survives on the merits, and if the ordinance could be properly applied to a private railroad corridor, the presumption has been overcome with respect to damages based on the County franchise ordinance.  The courts reads the FTA to require that any damages based on the local franchise law be "fair and reasonable."  Although states and localities may manage their public rights-of-way and may require fair and reasonable compensation from providers on a competitively neutral basis, see 47 U.S.C.

§ 253(c), the FTA preempts any state or local requirement that "prohibit[s] or has the effect of prohibiting" any company from providing telecommunications services, see 47 U.S.C. § 253(a).  Unless restricted to a "fair and reasonable" amount, the County's attempt to recover years of profits from AT&T, without any correlation to the County's limited right to "manage" its right-of-way, could only be considered as "prohibit[ing] or hav[ing] the effect of prohibiting" AT&T's provision of telecommunications services via its underground fiber optic cable.

The County's arguments in opposition are simply irrelevant to the preemption analysis.  It does not matter that the franchise ordinance predates fiber optics.  Nor does it matter that the County's stated objective is not to regulate telecommunications.  It is permitted to know "what is buried and where," but in doing so, it may not unduly interfere with AT&T's ability to provide telecommunications services.  Assuming that the County has the authority to manage the railway right-of-way, its attempt to recover anything beyond "fair and reasonable" compensation would be preempted by the FTA.

For the time being, the court is not persuaded by AT&T's argument that the County's franchise ordinance itself is entirely preempted by the FTA.  The court agrees that it is problematic under the FTA that the ordinance reserves discretion in the County administration to grant the franchise, that the franchise may be renewed at the County's option, and that it must contain provisions "securing efficiency of public service at reasonable rates."  Baltimore County Code § 3-9-

201(f), 202(b)(1), (c)(1).  Other than insisting that its franchise ordinance is "the
least demanding in the United States," the County does not directly address these
issues.  It does not matter whether the ordinance is the least demanding in the
United States, or whether it has fewer words than other such ordinances.  If the
demands it makes through the words it uses are in conflict with the FTA, it will be
preempted.  But where the County has actually granted permission and charges
only a fair and reasonable fee for use of public rights-of-way, the saving clause in
the FTA appears to leave room for this modest level of local regulation.  See
47 U.S.C. § 253(c).

AT&T's motion on the franchise fee element of the County's claim for
damages is granted.  The court need not address AT&T's state preemption
argument.

VII.   *Defendant Budd's Motion for Summary Judgment (Dkt. No. 38)*

Finally, the court grants defendant Frederick Budd's motion for summary
judgment.  Budd argues he is not personally liable on any of the County's claims
because he did not participate in any allegedly wrongful act against the County,
nor did he direct anyone else to commit such an act.

A.      *Undisputed Facts*

Budd worked for AT&T and its related entities from 1957 until he retired in 1989. His title between the years 1986 and 1989 was "Manager, Right of Way" for the eastern United States. Dkt. No. 40, Ex. A at 4, 21, Ex. B at ¶ 2. He was a "level two" employee, meaning that he was one level from the bottom and four levels below the most junior of AT&T's corporate officers, who were ranked at "level six" and higher. Dkt. No. 40., Ex. B at ¶ 3. Budd supervised a staff of nine. Dkt. No. 48, Ex. 1 at 22.

Budd negotiated with representatives of the railroads for AT&T's access to the railroad corridor. Dkt. No. 40, Ex. B at ¶ 4. It was his job to obtain the best terms for AT&T. *Id.* at ¶ 4. As he put it, "I was negotiating with the railroad. Railroads set a price. We can take it or we can leave it. I decided we would take it. . . . Because we needed their corridor . . . . So that we could get our fiber optic in the ground." Dkt. No. 48, Ex. 1 at 29. Budd knew that it might have been possible for AT&T to have installed the cable through individual properties, either through consent or condemnation, but that process was "slow," "manpower intensive," "expensive," and "inconvenien[t] to the general public." Dkt. No. 48, Ex. 1 at 30-33. Budd did not decide on AT&T's behalf to install the fiber optic cable in the railroad corridors, he did not participate in AT&T's decision to do so, and he did not cause AT&T to make that decision. Dkt. No. 40, Ex. B. at ¶ 6. Budd chose neither the railroads with which he negotiated nor the corridors for which he negotiated. *Id.* at ¶ 4. He executed a supplement to the CSX contract, but he did not execute the contract itself. Dkt. No. 40, Ex. B at ¶ 5. Without the authority

of higher-ranking AT&T employees, Budd could not have executed the supplemental contract on AT&T's behalf.  Dkt. No. 40, Ex. B at ¶ 5.

Budd never personally entered the CSX corridor or the County's properties along the CSX corridor.  Dkt. No. 40, Ex. B at ¶ 7.  He did not direct AT&T or any of its contractors or employees to enter the railroad corridor land parcels at issue, or to bury fiber optic cable on the parcels.  *Id.* at ¶ 6.  Budd had no role in the actual construction of AT&T's fiber optic telecommunications network or in installing cable in the County, and he was not present on the railroad corridor properties when the cable was laid.  Dkt. No. 40, Ex. A at 15-16, 87-88, Ex. B. at ¶ 6.  Also, Budd has had no role in the continued presence of AT&T's fiber optic cable along the twelve Lathrop Parcels.  Dkt. No. 40, Ex. B at ¶ 6.

B.    *Personal Liability for Budd*

The general rule in Maryland is that corporate officers or agents may be held personally liable for those torts that they personally commit, or that they "inspire or participate in, even though performed in the name of an artificial body." *Tedrow v. Deskin*, 290 A.2d 799, 802 (Md. 1972) (corporate officers may be liable for knowingly and intentionally conspiring to sell a car with a false odometer reading to plaintiff).  "[P]articipation in the tort is essential to liability.  If the officer takes no part in the commission of the corporation's tort, he is not personally liable therefor unless he specifically directed the particular act to be done, or participated

-59-

or cooperated therein." *Id.* For an officer of a corporation to be liable for the negligence of the corporation, the officer must have breached his duty such that he or she "contributed to, or helped to bring about, the injury." *Id.* at 803.

The parties disagree as to whether Maryland law requires that the corporate agent be an "active" participant in the tort to be held personally liable. The County relies primarily on *Tedrow*, cited above, and argues that "active" participation is not necessary to find liability – liability may be premised on the officer's mere "participation" or "cooperation" in the commission of the tort. Dkt. No. 48 at 10, citing *Metromedia Co. v. WCBM Maryland, Inc.*, 610 A.2d 791, 794 (Md. 1992); *Tedrow*, 290 A.2d at 802-03. AT&T cites *Fletcher v. Havre de Grace Fireworks, Co.*, 177 A.2d 908, 910 (Md. 1962), and *Shipley v. Perlberg*, 780 A.2d 396, 400-01 (Md. App. 2001), disagreed with on other grounds by *Allen v. Dackman*, 991 A.2d 1216, 1226 n.13 (Md. 2010), and argues that an agent's "active" participation is required for liability to attach. Dkt. No. 39 at 5.

The semantics here are less important than the facts of the cases cited by the parties. What each has in common is the recognition that where a corporate officer or agent himself commits a discretionary act instrumental to the commission of the tort, the officer or agent can be found personally liable for the torts of the corporate employer. Without such an act, there is no individual liability.

For example, in *Tedrow*, the plaintiff purchased an automobile.  He later sued the principal owners and stockholders of the dealership, as well as two employees, alleging that the odometer of the car had been rolled back and that the individual defendants had falsely and fraudulently represented that the lower number was the true mileage.  *Tedrow*, 290 A.2d at 801.  The plaintiff alleged that the individual defendants "sold the car to him 'with express or implied knowledge' in respect of the actual mileage and that they 'conspired with each other to alter the correct mileage and misrepresented same to be less than it actually was on the odometer, intending thereby to defraud' him."  *Id.* at 803.  Based on these allegations that the defendants had committed acts instrumental to the fraud, the claim was allowed to proceed past the pleading stage against the individual owners and employees of the corporate tortfeasor.

In *Metromedia Co. v. WCBM Maryland, Inc.*, also cited by the County, the decisive question again was whether the corporate officer had taken a discretionary step instrumental to committing the tort.  Plaintiff Metromedia ordered the defendant radio station to vacate its sub-let property.  The chief executive officer of the station made the decision to refuse to vacate the premises.  610 A.2d at 793.  Metromedia brought an action in ejectment against both the station and the CEO.  At trial, the court granted judgment as a matter of law in favor of the corporate officer.  On review, the appellate court reversed, finding that the plaintiff had offered evidence sufficient to establish that the officer had decided that the station

would not vacate the premises "notwithstanding its lack of any right to occupy it." *Id.* at 795.

The court in *Fletcher v. Havre de Grace Fireworks Co.*, however, found that individual corporate officers could not be held liable after a fireworks plant exploded. The explosion injured the plaintiff and damaged her home. She sued the fireworks company, as well as its officers and directors individually, arguing that the officers and directors were personally liable because they controlled the conduct of the business. The trial court dismissed the plaintiff's claims against the individual officers on the grounds that the plaintiff's allegations were "too general to charge [the directors] with liability." *Fletcher*, 177 A.2d at 909. The Court of Appeals affirmed, explaining:

> It is manifest, we think, that the allegation . . . that the officer-director defendants had and exercised "complete direction and control over all phases of the conduct of the business of the defendant company," and the more comprehensive allegation of similar import in the negligence, extra-hazardous and nuisance counts, fall far short of alleging that the individual defendants had personally directed or actively participated or cooperated in the tort committed by the corporation.

*Id.* at 910. While this outcome could possibly be explained by Maryland's pleading requirements, *see* Md. R. Civ. P. 2-305, it remains inconsistent with the County's claim that a party may be individually liable for *any* participation in a corporation's torts. After all, the *Fletcher* defendants' direction and control of all aspects of the defendant company could have supported a conclusion that they had at least some

form of indirect participation in the alleged tortious conduct, sufficient to sustain the complaint if that were all that Maryland law required.

In *Shipley*, 780 A.2d 396, the plaintiff had lived as a child in a corporate-owned rental property that was contaminated with lead.  As an adult, he sued the (former) corporate officer and director of the management company, alleging that the individual defendant had "directly controlled and made decisions concerning the management of the subject property." *Id.* at 398.  The defendant introduced uncontroverted evidence showing that he had no "direct involvement" in the subject property, however. *Id.*  Relying on *Tedrow*, the appellate court found that dismissal of the plaintiff's claims was proper because he had failed to produce evidence that the defendant "actively participated in decisions relating to the maintenance of the subject property, or the existence of lead paint thereon.  Absent such evidence, [the defendant] cannot be held liable for the negligent acts of the corporation in permitting lead paint to remain on the subject property." *Id.* at 406. This outcome is also consistent with a rule that actions not instrumental, but only indirectly related, to the commission of a corporation's torts may not give rise to individual liability for those torts.

Just this year, Maryland's highest court has applied these same principles. In *Allen v. Dackman*, 991 A.2d 1216, 1218 (Md. 2010), the plaintiffs sued a member of a limited liability company, alleging that they were injured by lead-based paint while living in the LLC's property.  Reversing summary judgment for the defendant,

the Court of Appeals reaffirmed that an LLC member, like any corporate officer or agent, is liable for the LLC's torts he "personally commits, inspires, or participates in." *Id.* at 1229.  The defendant could be held personally liable because he had "managed [the LLC's] day-to-day affairs during the [relevant] period . . . and there [was] no evidence that anyone else managed those affairs during that period." *Id.* at 1230.  In that position, he could have chosen to instruct his employees to maintain (or not maintain) the property, or he could have chosen not to instruct anyone to do anything at all. *Id.* As the facts of *Allen* reveal, particularly in light of the contrary outcome in *Shipley* (which the *Allen* court explicitly approved, *id.* at 1226 n.13), liability may be imposed on a corporate employee when he has committed an act instrumental to the corporation's tortious conduct, particularly if that act was discretionary in nature.

Based on these cases, the court rejects the County's reading that any employee may be held liable for the tortious acts of a corporate actor so long as the employee "participated" or "cooperated" in any way, however slight.  Lest virtually every employee of a corporate actor be made personally liable for the corporations's torts, a line must be drawn.  For example, under the County's argument, could an assistant who photocopied or proofread the agreements be deemed a "participant" in the alleged tort?  What about the employees who maintained the machinery that was used to install the cable?  They also could be said to have "participated" in the alleged tort, although their participation would not have been discretionary or instrumental to the commission of that tort.

Here, Budd knew of AT&T's intention to secure railroad rights-of-way so that AT&T's cable could be installed.  He knew that although there were alternatives, those alternatives were undesirable options for AT&T.  He negotiated with CSX for permission to use CSX's right-of-way, accepted on AT&T's behalf the price set by the railroad for that permission, and executed a supplement to the CSX agreement. But Budd had no independent decision-making authority.  The undisputed facts show that he did not decide that AT&T's cable would be installed on railroad rights-of-way.  He did not choose the railroads or the rights-of-way.  He also had no role in the actual installation of the cable and was not present on the railroad corridor properties when the cable was installed.  The undisputed facts show that Budd's "participation" in AT&T's conduct was not of the discretionary, instrumental sort recognized by *Tedrow* and *Metromedia Co.* as necessary to warrant a finding of individual liability.  Budd's motion for summary judgment is granted.

*Conclusion*

The court grants summary judgment in favor of defendant Budd on all claims against him individually.  The court grants summary judgment in favor of defendant AT&T on all claims based on Lathrop Parcels 7, 10, 11, and 12.  The court also grants partial summary judgment to AT&T to the effect that the County may not recover any damages based on alleged violations of the County's franchise ordinance on the remaining parcels.  (In the alternative, if such recovery were

permitted at all, it would be limited to amounts that are "fair and reasonable" under the Federal Telecommunications Act.)  In all other respects, AT&T's pending motions for summary judgment (Dkt. Nos. 33, 102, 121, and 128) are denied.

After the discovery issue addressed in Part III is resolved, the court intends, pursuant to 28 U.S.C. § 1407(a), to invite the Judicial Panel on Multi-District Litigation to transfer this action back to the District of Maryland.  See also *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) (holding that such transfers are mandatory, and transferee court may not rely upon 28 U.S.C. § 1404(a) to transfer case to itself).  The court will set a status conference to address resolution of the discovery issue regarding the exact location of the cable.

So ordered.

Date: July 23, 2010

_____
DAVID F. HAMILTON, CIRCUIT JUDGE*
*(sitting by designation)

Copies to:

James McGinnis Boyers
WOODEN & MCLAUGHLIN LLP
jboyers@woodmclaw.com, cbutler@woodmclaw.com, rbritt@woodmclaw.com

Jeffrey Grant Cook
BALTIMORE CO. OFFICE OF LAW
jgcook@baltimorecountymd.gov

Douglas Stewart Dove
TIMOTHY E. HAYES & ASSOCIATES LC
ddove@tehayes.com,adavis@tehayes.com

Timothy Edward Hayes
TIMOTHY E. HAYES & ASSOCIATES LC
thayes@tehayes.com,adavis@tehayes.com

Peter Webb Morgan
DICKSTEIN SHAPIRO MORIN & OSHINSKY
morganp@dicksteinshapiro.com